# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

*In the Matter of the Search of*

**APPLICATION & AFFIDAVIT FOR SEARCH WARRANT**

Case Number: 09-M-472

Information association with alexander_dobek@yahoo.com and a.dobek@xmaxioncerta.com that is stored at premises owned, maintained, controlled, or operated by Yahoo, Inc. a company headquartered in Sunnyvale, California from May 12, 2009, to the present.

I, Gerald Shinneman, being first duly sworn depose and state:

I am a Special Agent of the United States Department of Justice, Federal Bureau of Investigation, and have reason to believe that in:

> Information association with alexander_dobek@yahoo.com and a.dobek@xmaxioncerta.com that is stored at premises owned, maintained, controlled, or operated by Yahoo, Inc. a company headquartered in Sunnyvale, California from May 12, 2009, to the present.

there is now concealed certain property, namely: See Attachment A which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure): evidence of conspiracy to export munitions list items in violation of 22 U.S.C. § 2778.

The facts to support a finding of Probable Cause are as follows: **Please see attached affidavit.**

Continued on the attached sheet and made a part hereof. √ Yes   No

Signature of Affiant: Gerald Shinneman

Sworn to before me, and subscribed in my presence

August 7th, 2009 at 10:30 AM    at Milwaukee, Wisconsin
Date and time issued             City and State

HONORABLE WILLIAM E. CALLAHAN
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

Gerald Shinneman, being duly sworn, does hereby depose and state:

## A. INTRODUCTION

1. I am a Special Agent assigned to the Milwaukee Field Office of the Federal Bureau of Investigation. I have been a Special Agent with FBI since January 2002. I have attended several export and specialty training seminars addressing United States export controls involving national security and other issues. I have participated in numerous investigations of violations of United States export laws. As a result of my training and experience, I am familiar with federal laws relating to the unlawful exportation of goods and technology.

2. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo, Inc. to disclose to the government records and other information in its possession pertaining to the subscribers or customers associated with certain email accounts, including the contents of communications.

3. I am thoroughly familiar with the information contained in this affidavit based upon my personal observations and my investigation of this matter as well as my discussions with other law enforcement agents and witnesses and my review of documents. Since this affidavit is submitted for the limited purpose of obtaining a search warrant, I have not included each and every detail that I have learned during this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the search warrant sought herein.

## B. BACKGROUND OF INVESTIGATION

4. The Federal Bureau of Investigation, the U.S. Bureau of Immigration and Customs Enforcement (ICE), and the US. Department of Defense, Office of Inspector General, Defense Criminal Investigative Service (DCIS) are currently investigating Ronald Alexander Dobek and

his business, XM Axion Certa. Investigation to date has included the use of subpoenas to banks, electronic component suppliers, shipping companies, the use of court-ordered pen register and trap and trace devices, use of 2703(d) orders, physical surveillance, search warrants, and witness interviews.

5. The investigation has revealed that Dobek may be using his businesses to illegally transfer sensitive, national-security controlled items to Venezuela and may be wiring money into and out of the United States in furtherance of this crime.

### C. DESCRIPTION OF THE LOCATION TO BE SEARCHED

6. This affidavit is submitted in support of an application for search warrant to search:

> Information association with alexander_dobek@yahoo.com and a.dobek@xmaxioncerta.com that is stored at premises owned, maintained, controlled, or operated by Yahoo, Inc. a company headquartered in Sunnyvale, California from May 12, 2009, to the present; and

> Information association with ontiv@yahoo.com, that is stored at premises owned, maintained, controlled, or operated by Yahoo, Inc. a company headquartered in Sunnyvale, California from August 2006 to the present.

### D. BACKGROUND OF EXPORT CONTROL LAWS AND VENEZUELA

7. Based on my training and experience, I am aware that the Venezuelan Air Force (VAF) has used F-16 aircraft for its military for many years, which they obtained, in part, from the United States when the two countries were allies. In order to export F-16 parts or services from the United States to Venezuela or any other country, any exporter was required to obtain authorization and licensing from the Department of State.

8. However, in August 2006, the Department of State gave notice that the United States was revoking authorization of the export of defense articles and defense services to Venezuela. That revocation covered all F-16 military aircraft component parts and related defense articles. See 22

C.F.R. §§ 121.1, 126.1(a); 71 Fed. Reg. 47554. As such, beginning by at least August 2006, no F-16 parts, technology, or components could be exported to Venezuela as the U.S. Department of State was no longer issuing export licenses for defense articles intended for Venezuela.

9. Exporting any F-16 military aircraft component parts or related defense articles without the required license or conspiring to do so is a violation of Title 22, United States Code, Sections 2778(b)(2)(A) and (c), and is punishable by ten years' imprisonment or a $1,000,000 fine.

### E.   PROBABLE CAUSE

10. Ronald Alexander Dobek is currently employed as electrical engineer for DERCO, a Wisconsin-based aircraft parts supply company. Prior to Summer 2006, DERCO legally had maintained contracts with the Venezuelan Air Force (VAF).

11. After the ban on military exports to Venezuela, a confidential source in California notified the FBI that GDCA[1] and DERCO might be working together to sell or transfer an F-16 flight simulator circuit board[2] to Venezuela, in violation of the Department of State's ban on the export of military components to Venezuela. The source stated that he/she believed that DERCO may be representing the Venezuelan Air Force in an attempt to service F-16 flight simulators, and that DERCO may have contracted with GDCA to reverse engineer 45 circuit boards for the F-16 simulator.

---

[1]   GDCA, a California-based company, acquires licenses for, and reverse engineers, obsolete or low-demand circuit boards for outdated computers. GDCA does not manufacture the parts; it either acquires the parts from the original manufacturer, or obtains the parts independently and then reverse engineers them.

[2]   According to the Office of Defense Trade Control, the circuit cards or boards at issue for the F-16 flight simulator are licensable under U.S. Munitions List Article Category IX - Military Training Equipment and Training, subsection (I) - Technical data and defense services directly related to defense articles enumerated in paragraphs (a) and (b) of § 121.1 Category IX.

12. The source indicated that Arlin Nierenberger, the Director of Engineered Legacy Solutions at GDCA, was working with "Alex Dobek" from DERCO, on the F-16 project. The source, who had been employed at GDCA, had reviewed schematics for the project. Those schematics indicated that the circuit boards were probably destined for the VAF. The source stated that s/he had discussed the Venezuelan connection with Nierenberger and others at GDCA, but they all rebuffed the source's concerns about shipping these circuit boards to Venezuela. It was apparent to the source that several at GDCA, including Nierenberger, knew that the circuit boards were destined for Venezuela in violation of law.

13. Through law enforcement garbage searches done on GDCA and Nierenberger, law enforcement learned that the F-16 flight simulator project is worth approximately $800,000. In December 2007, they recovered an e-mail which reflected that Dobek had been in South America in summer 2007 to obtain copies of the schematics for the F-16 flight simulator which he intended to pass on to GDCA and that Dobek had informed Nierenberger that he maintained the software and source code for the flight simulator.

14. According to Fed-Ex records, on July 3, 2008, a package was delivered to Dobek's home address, 703 S. 2nd Street, Milwaukee, Loft H, from Tracy, California, which is the city in which Nierenberger resides. According to Treasury Enforcement Communication System travel records,[3] on July 4, 2008, Dobek traveled from Milwaukee, Wisconsin to Venezuela on a flight which left Chicago and stopped in Mexico City, Mexico and Bogota, Colombia. Dobek then returned from Venezuela to the U.S. on either July 9, 2008, or July 10, 2008. Based on the information from the source in California, combined with the timing of the shipment and

---

[3] The U.S. Treasury and the Department of Homeland Security maintain the Treasury Enforcement Communication System or "TECS" which records each time an individual uses his/her passport to enter or exit the United States.

Dobek's travel, I believe that Dobek hand-carried these circuit boards to Venezuela in violation of 22 U.S.C. § 2778.

15. On September 27, 2008, Dobek was stopped by Customs and Board Patrol arriving from Norway into the United States. He told border agents that he had been meeting with the Norwegian Military for discussions about F-16 planes. When questioned about travel and work-related issues, Dobek first claimed he had recently visited Venezuela to visit a girlfriend, starting in May 2006. He eventually admitted to being in Venezuela for business in early 2008. He claimed that in late 2007 or early 2008, his boss at DERCO e-mailed an avionics flight simulator to the Venezuelan military and that in January 2008, Dobek had serviced a system or part for the VAF. He said that VAF had purchased a Phase Noise System, and Dobek had been servicing those parts. According to ICE agents, such activity is also in violation of Title 22, United States Code, Section 2778.

16. In November 2008, a Florida-based company, ISO Group contacted DCIS. ISO Group is a company which provides spare part logistics for the defense industry. ISO Group reported to DCIS that they had re-sold a computer to Alexander Dobek in August, 2008. This computer was shipped to Dobek's residence, 703 S. 2nd Street, Loft H, Milwaukee, from New Resources Aviation in Miami, Florida, on behalf of ISO. According to ISO Group, Dobek had contacted them about obtaining a computer from New Resources and re-selling it to him. ISO agreed to this transaction and agreed to re-sell the computer to Dobek for 20% more than the price it paid New Resources Aviation.

17. New Resources Aviation shipped the computer, via UPS, to Dobek at his home address on August 14, 2008. As of November, 2008, the computer, valued at approximately $72,000, had not been paid for by Dobek.

18. This computer, called an Expanded Fire Control Computer, is export-controlled and cannot currently be exported to Venezuela. According to employees at ISO Group, prior to purchasing the computer, Dobek signed agreement that this computer would not be sold or taken out of the United States. Dobek informed ISO employees that this computer would be sent to an "up and up" company located in Houston, Texas. ISO Group indicated that it communicated with Dobek through his email account: a.dobek@xmaxioncerta.com.

19. Despite Dobek's statements that he was not exporting the computer, ISO Group employees reported to DCIS that they were still concerned about Dobek's intentions because, while ordering the computer, Dobek included, among the e-mail documents he sent to them, an attachment with a header that read: "Venezuelan F-16 Requirements" and a list of 53 parts. ISO Group employees questioned Dobek about the document, because of the export ban to Venezuela. Dobek explained that he had received the list from Venezuela and continued to use the body of the document, but could not change the header. He assured them that the computer was not going to be exported to Venezuela. Dobek stated that before sending it to Houston, the computer would go to his "engineering house" in Nevada. ISO Group sold the computer to Dobek and had it shipped to Dobek's residence from New Resources Aviation.

20. According to UPS records, Dobek received this computer on August 18, 2008. On August 24, 2008, Fed-Ex records revealed that Dobek shipped a package with a similar weight to the Expanded Fire Control Computer to Ernest Clifford, TE&J Inc., Reno, Nevada. According to TE&J's website, the company provides a wide range of engineering services in the electrical and computer engineering fields. According to the website, one of TE&J's current projects is an "F-16 Flight Computer."

21. Based on an ISO Group's employee's contact with a DCIS agent, I am aware that as of

April 2009, Dobek still had not paid ISO Group for the computer. As a result, an ISO employee sent an email to Dobek at a.dobek@xmaxioncerta.com, threatening that ISO Group would contact Derco if Dobek did not pay for the computer. Dobek then called the ISO employee. He promised payment shortly. A cashier's check for a portion of the purchase price of the computer was mailed to ISO Group from Dobek within days of ISO Group threatening to contact Dobek's legitimate employer.

22. On April 30, 2009, I determined that a package weighing 37 pounds had been sent to Dobek's home via UPS. The package was sent from Tommy Joiner, TE&J, Reno, Nevada, but the UPS account which paid for the shipment was GDCA in California.

23. On May 5, 2009, this Court authorized a search of the above-described package, case number 09-M-460. On May 5, 2009, the warrant was executed. Upon opening the package, I determined that the package, did, in fact, contain an Expanded Fire Control Computer. According to Air Force personnel who inspected the computer, the only purpose this computer has is to be placed into an F-16 fighter jet, or an F-16 flight simulator. Air Force personnel also informed me that this Computer did not currently have an Operational Flight Plan (OFP) loaded into its memory. Also according to Air Force personnel, this computer has not been properly de-militarized, meaning that it was not properly rendered inoperable, as is by required the Department of Defense, before this item could be released from the custody of the Air Force.

24. I have had contact with Captain Daniel Statz of the Wisconsin Air National Guard. He has informed me that the computer which Dobek obtained from ISO Group, and shipped to Nevada, and I inspected in May 2009, is an item which the U.S. Air Force records reflect is still supposed to be located at Hill Air Force Base, in Northern Utah. It is not clear to Captain Statz how this item was sold to Dobek by New Resources Aviation, through ISO Group.

25. Because it was not clear that the Expanded Fire Control Computer was, in fact, stolen, from Hill Air Force Base, and because it was not clear, at the time, that Dobek intended to export this computer or use it in furtherance of an export violation, the Expanded Fire Control Computer was returned to UPS and ultimately delivered to Dobek. Based on information obtained from Fed-Ex, I am aware that in July 2009, Dobek shipped the Expanded Fire Control Computer to New Resources Aviation.

26. I have had contact with Yahoo, Inc. a provider of electronic communications services. Yahoo, Inc. has informed me that a.dobek@xmaxioncerta.com is a small-business email account provided by Yahoo, Inc. and which shares an inbox with Dobek's other Yahoo account: alexander_dobek@yahoo.com. Based on a second search warrant from this Court, case no. 09-M-458, I obtained the contents of Dobek's Yahoo email accounts from 2006 until May 11, 2009.

27. A review of the sent and received emails from Dobek's Yahoo email accounts has revealed numerous details about Dobek's illegal activities. For example, on June 12, 2007, Dobek sent an email to "Miguel Ontiveros" at ontiv2@yahoo.com. That email contained an attachment which was a contract between Dobek and Miguel Ontiveros of the Venezuelan Air Force to provide a computer assembly and engineering for an "Expanded Fire Control Computer" Operational Flight Program System Integration Unit in exchange for $175,000.[4] This system, to be provided by Dobek to the VAF would allow the VAF to use a commercial

---

[4] Investigation has also revealed that Dobek maintains bank accounts at US Bank, including a business account under Ronald Alexander Dobek, d/b/a XM Axion Certa (2/1/2008 - 9/30/2008), and d/b/a AET Engineering (6/30/2007 - 1/31/2008). That account shows payments to airlines, hotels, and other expenditures in and related to Venezuela, and seem to reflect deposits and withdrawals that could not be explained solely by his salary from DERCO as an engineer. For example, on April 1, 2008, he received a wire transfer deposit of $57,000 from Petroleos De Venezuela. On February 6, 2008, he received an $87,480 wire transfer deposit from VIAR International, an export company in Florida. On November 23, 2007, he received a $31,230 wire deposit from Arlin Nierenberger.

computer to load the flight plan (OFP) into an F-16 Expanded Fire Control Computer.

28. I reviewed other emails reveals other emails between Dobek at either a.dobek@xmaxioncerta.com or alexander_dobek@yahoo.com and Ontiveros at ontiv2@yahoo.com. In an email dated March 27, 2007, Dobek wrote Ontiveros "Refer to the attached, this will be the equipment that you will use to load the OFP." The "attached" is a diagram of a computer, a box that resembles a large calculator, and the Expanded Fire Control Computer. Based on a review of Fed-Ex records, I am aware that on May 21, 2008, Dobek shipped a package from XM Axion Certa, using his home address, to "M. Ontiveros, Network Tocontiv S.R.L.," in El Orticeno, Palo Negro, Aragoa, Venezuela. The invoice for this shipment said it contained four computers, and a "TV Tuner/ATI Vision Tek." I believe that these computers might be part of the contract between the VAF and Dobek and would be used to load the F-16 flight program (OFP) onto the Expanded Fire Control Computer which is inside each F-16. If true, such activity is another violation of 22 U.S.C. § 2778.

29. Another email between Dobek and Ontiveros instructs Ontiveros to bring Dobek the F-16 flight program (OFP) for the F-16 when he flies from Venezuela to Texas in March 2007. Numerous other emails between Ontiveros and Dobek, or Dobek and Arlin Nierenberger of GDCA reveal technical discussions about F-16 related engineering projects, including an email about the circuit boards that Nierenberger built for Dobek. In addition, I reviewed several emails from Nierenberger to Dobek about TE&J not performing its part of the contract for the Expanded Fire Control Computer.

30. On July 2, 2009, FBI agents in Reno, Nevada, interviewed Tommy Joyner of TE&J. Joyner stated that he had been hired by Dobek to do custom engineering work to permit computer interactions with the Expanded Fire Control Computer. Dobek sent the Expanded Fire Control

Computer to Joyner in August 2008. Joyner and his partners at TE&J attempted to do the work requested by Dobek, but could not complete the project due to insufficient resources. Dobek then requested the computer back and Joyner's partner, Ernest Clifford, sent the Computer back to Dobek on April 24, 2009.

31. Based on a review of emails from Dobek's email account, I am also aware that Dobek and Nierenberger were looking for another company to perform the work requested of TE&J. Based on intercepted emails, I am also aware that Jason Bauman, an employee of New Resources Aviation may be involved in this conspiracy. In an email dated October 26, 2006, Bauman wrote to Dobek, "I would jump at the opportunity of working for the VAF. Bro, ask them to pay you 120K a year tax free..."

32. In light of the foregoing, I believe that Alexander Dobek, Miguel Ontiveros, Arlin Nierenberger, Jason Bauman, and others are engaged in a conspiracy to export F-16 equipment and technical information to Venezuela in violation of 22 U.S.C. § 2778. I further believe that evidence of this offense can be found in the emails from May 12, 2009, to the present for email accounts a.dobek@xmaxioncerta.com and alexander_dobek@yahoo.com and emails of Ontiveros at ontiv2@yahoo.com from August 2006 to the present.

**F. TECHNICAL INFORMATION RE: SEARCHES OF EMAIL ACCOUNTS**

33. In my training and experience, I have learned that Yahoo, Inc. provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public. Subscribers obtain an account by registering with Yahoo, Inc. During the registration process, Yahoo, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Yahoo, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Yahoo, Inc. subscribers) and information concerning subscribers and their use of Yahoo,

Inc. services, such as account access information, e-mail transaction information, and account application information.

34. In general, an e-mail that is sent to a Yahoo, Inc. subscriber is stored in the subscriber's "mail box" on Yahoo, Inc. servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Yahoo, Inc. servers indefinitely.

35. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Yahoo, Inc.'s servers, and then transmitted to its end destination. Yahoo, Inc. often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Yahoo, Inc. server, the e-mail can remain on the system indefinitely.

36. An Yahoo, Inc. subscriber can also store files, including e-mails, address books, contact or buddy lists, pictures, and other files, on servers maintained and/or owned by Yahoo, Inc.

37. Subscribers to Yahoo, Inc. might not store on their home computers copies of the e-mails stored in their Yahoo, Inc. account. This is particularly true when they access their Yahoo, Inc. account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

38. In general, e-mail providers like Yahoo, Inc. ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

39. E-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations,

the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Yahoo, Inc.'s website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

40. In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

41. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Yahoo, Inc. to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment A. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment A.

### G. CONCLUSION

42. Based on the foregoing, I submit that there is probable cause to believe that on the computer systems in the control of Yahoo, Inc. there exists evidence of a crime of conspiracy to export munitions list items in violation of 22 U.S.C. § 2778. Accordingly, a search warrant is

requested. This Court has jurisdiction to issue the requested warrant because it is "a court with jurisdiction over the offense under investigation." See 18 U.S.C. § 2703(a). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of the warrant.

# ATTACHMENT A

I.  Information to be disclosed by Yahoo, Inc.

To the extent that the information described in Attachment A is within the possession, custody, or control of Yahoo, Inc., Yahoo, Inc. is required to disclose the following information to the government for each account or identifier listed in the search warrant:

a.  The contents of all e-mails stored in the account, including copies of e-mails sent from the account;

b.  All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.  All records or other information stored by an individual using the account, including address books, contact and buddy lists, pictures, and files;

d.  All records pertaining to communications between Yahoo, Inc. and any person regarding the account, including contacts with support services and records of actions taken.

II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of the statutes listed on the warrant involving Ronald Alexander Dobek from May 12, 2009 to the present and involving Miguel Ontiveros from August 2006 to the present including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.  The crimes of conspiracy to export munitions list items in violation of 22 U.S.C. § 2778.

b.  Records relating to who created, used, or communicated with the account or identifier.